UNITED STATES of America,
Plaintiff,

v.

Alan Louis HUNYADY, Defendant.

No. CRIM. 02–50059.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 22, 2003.

Thomas M. Donnellan, Flint, MI, for defendant.

## OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE

GADOLA, District Judge.

On October 16, 2002, a federal grand jury rendered a three-count indictment against Defendant: (1) possession of an unregistered machine gun, 26 U.S.C. § 5861(d); (2) possession of an unregistered silencer, *id.;* and (3) being a felon[1] in possession of firearms, 18 U.S.C. § 922(g)(1). On July 17, 2003, Defendant moved to suppress the firearms that support these three charges arguing that federal agents seized this evidence in violation of the Fourth Amendment. The Court held an evidentiary hearing on the matter on September 3, 2003. For the reasons set forth below, the Court will deny the motion.

## I. BACKGROUND

Defendant's father, Leslie C. Hunyady, owned and occupied a home at 5437 Country Lane, Flint, Michigan (hereinafter "the premises") until his death on December 28, 2001. Prior to his death, the father permitted Defendant to live on the premises without a lease and without paying rent.

After the father's death, James R. Visser, the representative of the father's estate, managed the premises on behalf of the estate. The father's will deliberately made no provision for Defendant (i.e., Defendant was not a beneficiary), and, on or about January 2, 2002, Mr. Visser demanded that Defendant vacate the premises. Defendant refused, and, at approximately this same time, Mr. Visser changed the locks on the premises so as to exclude Defendant from the premises.[2]

Soon thereafter, on or about January 7 or 8, 2002, Defendant broke into the premises via a basement window and proceeded to live on the premises. During this period, Mr. Visser was preparing the premises for sale, and he entered and exited the premises as he wished. For example, on February 25, 2002, Mr. Visser entered the premises to inventory the father's remaining personal property. While on the premises, Mr. Visser noticed, and then photographed, two firearms and a silencer. At this same time, Mr. Visser served a

---

1. According to the indictment, Defendant was convicted and sentenced in Oakland County Circuit Court for carrying a concealed weapon, a crime punishable by imprisonment of more than one year. Defendant was sentenced on May 28, 1996.

2. Defendant also had access to another residence in Clio, Michigan. According to Defendant, a majority of his clothing and personal possessions were at the Clio residence at the time of his father's death. Additionally, as late as February 2002, Defendant paid the utility bill for the Clio residence.

notice to quit on Defendant stating that Defendant had to vacate the premises by March 3, 2002.

On February 25, 2002, Mr. Visser provided the photographs of the firearms and the silencer to John P. Miller, a special agent of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives. Mr. Visser informed Agent Miller that Defendant broke into the premises through a basement window soon after the father's death. Mr. Visser requested that federal agents accompany him to the premises to remove the firearms and the silencer. Mr. Visser told Agent Miller that he had a key to the premises and would allow the agents to enter and search the premises. Mr. Visser provided Agent Miller with copies of the father's will, a deed showing that the premises had been conveyed to the father, and letters of authority (dated February 19, 2002) from the Genesee County Probate Court appointing Mr. Visser the personal representative of the father's estate. Additionally, Mr. Visser informed Agent Miller about serving the notice to quit on Defendant, but he did not provide Agent Miller with a copy of the notice to quit.

Later, after a check of Defendant's background, Agent Miller learned that Defendant had a prior felony conviction. Instead of using this firearm and felony information to begin the process of obtaining a search warrant, Agent Miller contacted Assistant United States Attorney ("AUSA") Robert W. Haviland. Agent Miller relayed all Mr. Visser's information to AUSA Haviland. AUSA Haviland told Agent Miller that, if Defendant had simply broken into the premises, Defendant was a mere trespasser with no legitimate expectation of privacy in the premises, and that Mr. Visser, as personal representative, had the authority to admit the agents if he elected to do so.

Without performing any further research to verify Mr. Visser's allegations that Defendant was a trespasser, Agent Miller and three other federal agents escorted Mr. Visser to the premises the next day, February 26, 2002. Mr. Visser knocked on the front door, and Defendant opened the door. Defendant allowed Mr. Visser to enter. At this juncture, the agents did not make any inquires of Defendant so as to ascertain if in fact he was a trespasser. Further, the agents did not request or obtain Defendant's consent to search the premises. Then, without a warrant but pursuant to Mr. Visser's request, the agents entered and searched the premises. The agents seized the firearms and the silencer as well as several hundred rounds of ammunition.

## II. ANALYSIS

There are two issues in this matter: (1) whether Defendant has standing to assert a Fourth Amendment challenge to the search and seizure at issue in this case; and (2) whether Mr. Visser had apparent authority to consent to the search of the premises.

A defendant seeking to challenge a search or seizure pursuant to the Fourth Amendment must first establish that he has standing to challenge the search or seizure. *See United States v. Richards*, 147 F.Supp.2d 786, 788 n. 1 (E.D.Mich. 2001) (Gadola, J.), *aff'd*, 56 Fed.Appx. 667 (6th Cir.2003). Specifically, Defendant has the burden of showing that (1) he manifested a subjective expectation of privacy in the object of the challenged search and (2) society is prepared to recognize that expectation as legitimate. *See id.* In this case, Defendant has failed to meet his burden in regards to the second step of the standing inquiry.

In an attempt to establish a legitimate expectation of privacy, Defendant re-

lies on the notice to quit served on him by Mr. Visser on February 25, 2002. The notice to quit, Defendant argues, proves that he had a valid tenancy in the premises and was not a trespasser because, under Michigan property law, a notice to quit is unnecessary when ejecting a trespasser. *See* Mich. Comp. Laws. § 600.5714(1)(e).[3] Moreover, Defendant classifies his tenancy at the time of search as a tenancy at sufferance. *See* Def. Reply Br. at 2; Tr. at 53, ln. 20–21.[4] Defendant maintains that his tenancy at sufferance was valid at the time of the search because, although Mr. Visser had served a notice to quit on him, the seven-day period for vacating the premises under Mich. Comp. Laws § 554.134 had yet to run. That is, since Mr. Visser served the notice to quit on February 25, 2002, Defendant still had a valid tenancy at sufferance on February 26, 2002, when the federal agents searched the premises. Finally, Defendant concludes that, as a tenant at sufferance, he had a legitimate expectation of privacy in the premises because he was entitled to possess the premises until his tenancy was terminated by the operation of the notice to quit.

■ The Court disagrees. Assuming, *arguendo*, that Defendant is correct as to the first portion of his argument, i.e., that he had a valid tenancy at sufferance at the time of the search, he still did not have a legitimate expectation of privacy in the premises at the time of the search. That is because "*a tenant's expectation of privacy in [property] ceases to be objectively justifiable when his occupancy ceases to be lawful, as determined by ... the provisions of his state's landlord-tenant law.*" *United States v. Ross*, 43 Fed.Appx. 751, 757 (6th Cir.2002) (emphasis added; internal quotations omitted).[5]

■ "Important factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched." *United States v. McRae*, 156 F.3d 708, 711 (6th Cir.1998) (citing *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir.1991) (citing *Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. 421)). Here, Defendant did not own the premises. Further, Defendant had unlawful possession and/or unlawful control of the premises: Defendant defined a tenancy at suffer-

---

**3.** In Michigan, when a trespasser is in possession of premises, the person rightfully entitled to the premises may go immediately to court to begin "summary proceedings" to recover possession of the premises. *See* Mich. Comp. Laws. § 600.5714(1)(e). The same is not true when a tenancy is involved. For example, in order to begin summary proceedings against a holdover tenant, i.e., a tenant at sufferance, the person rightfully entitled to the premises must first satisfy certain notice to quit procedures, and these procedures take at least seven days. *See* Mich. Comp. Laws. § 600.5714(1)(c)(iii); Mich. Comp. Laws. § 554.134.

Thus, to summarize, one may go immediately to court to recover possession of premises from a trespasser, but one must wait to go to court to recover possession of premises from a tenant at sufferance until one complies with Michigan's notice to quit procedures.

Therefore, the only logical explanation for Mr. Visser's decision to employ a notice to quit, Defendant argues, is that Defendant was not a trespasser, for if he was, Mr. Visser could have saved valuable time and gone immediately to court to institute summary proceedings to eject Defendant from the premises.

**4.** Defendant contends that before his father's death, Defendant had a tenancy at will which then continued as tenancy at sufferance after his father's death.

**5.** "Although property concepts are not necessarily determinative of Fourth Amendment rights, they are nonetheless helpful in assessing which expectations society is prepared to recognize as legitimate." *Ross*, 43 Fed.Appx. at 757 (citing *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

ance as "a possessory interest in land which exists when a person who has an estate [in] land *wrongfully* continues in possession after the termination of the estate." Tr. at 52, ln. 10–13 (emphasis added); *see also* Tr. at 53, ln. 5–7. Thus, Defendant concedes, by his own definition, that he was wrongfully in possession of the premises. This "wrong is not criminal, but it is nevertheless, by construction of law, a wrongful act to retain possession of land a single moment after the right terminates." *Allen v. Carpenter*, 15 Mich. 25, 42–43 (1866) ("there is no middle ground between a rightful and a wrongful occupancy.").

 One cannot have a legitimate expectation of privacy in property that he wrongfully possesses. *See Ross*, 43 Fed. Appx. at 757–58 ("Even if, as [defendant] argues, [the landlord] was obligated under Kentucky law to institute formal eviction proceedings before he, as the landlord, could regain full possession of the [property], that does not change the fact that [defendant] had no reasonable expectation of privacy in [property] to which he had no legal claim."); *McRae*, 156 F.3d at 711; *People v. Carini*, 151 Ill.App.3d 264, 104 Ill.Dec. 546, 502 N.E.2d 1206, 1215 (1986) ("it is clear that [defendant's] possession of the [property] was wrongful and that his expectation of privacy in [that property] was not, irrespective of his subjective expectations to the contrary, 'legitimate' for purposes of the Fourth Amendment protections."); *People v. Baez*, 131 Misc.2d 689, 501 N.Y.S.2d 550, 552 (N.Y.Crim.Ct. 1986) ("wrongful possession . . . invalidates any expectation of privacy that our society is willing to recognize" (citing *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir.1980); *United States v. Manzanilla–de Jesus*, 507 F.Supp. 462, 465 (S.D.N.Y. 1981))).

 In other words, because Defendant, as a tenant at sufferance, wrongfully possessed the premises, his expectation of pri-vacy was illegitimate. *See Ross*, 43 Fed. Appx. at 757–58. To conclude otherwise would encourage the wrongful possession of property. Since society deems tenants at sufferance to be wrongful possessors of property, society is not prepared to recognize that such possessors have a legitimate expectation of privacy in such property. *See id.*

Furthermore, as to Michigan's notice to quit procedures on which Defendant so heavily relies, these provisions do not create a legitimate expectation of privacy; rather, they merely allow a tenant at sufferance to temporarily maintain his wrongful possession of the property. These procedural provisions do not legitimatize the wrongfulness of the possession. *See id.*

Consequently, the Court will deny the motion to suppress because Defendant lacks standing to contest the search and seizure at issue in this case. Having disposed of the motion on standing grounds, it is unnecessary to discuss Defendant's challenge to Mr. Visser's apparent authority to consent to the search of the premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 188–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C.Cir.1991).

**III. CONCLUSION**

**ACCORDINGLY, IT IS HEREBY ORDERED** that Defendant's motion to suppress evidence [docket entry 12] is **DENIED.**

**SO ORDERED.**